IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

|  |  |  |
|---|---|---|
| IN RE: XE SERVICES ALIEN TORT LITIGATION | ) ) ) ) ) | No. 1:09cv615 No. 1:09cv616 No. 1:09cv617✓ No. 1:09cv618 No. 1:09cv645 |

## MEMORANDUM OPINION

These five cases, consolidated for purposes of discovery and pretrial motions, present questions unresolved in this circuit concerning the scope and application of the Alien Tort Statute ("ATS") and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs—all Iraqi nationals or the estates of deceased Iraqi nationals—claim that defendants are liable for various injuries or deaths that occurred in Iraq. Defendants seek dismissal of the cases for lack of federal subject-matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P., and for failure to state claims upon which relief may be granted pursuant to Rule 12(b)(6), Fed. R. Civ. P. Defendants also argue for dismissal of the claims because they raise nonjusticiable political questions or, alternatively, on grounds of *forum non conveniens*. The motions have been fully briefed and argued, and are now ripe for disposition.

**I.[1]**

In these consolidated cases, a total of sixty-four plaintiffs—forty-five Iraqi nationals and

---

[1] The facts recited herein are derived largely from plaintiffs' complaints and are, as required at this stage in the proceedings, assumed to be true. *See Revene v. Charles County Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

-1-

the estates of nineteen deceased Iraqi nationals—seek damages for deaths or serious injuries certain plaintiffs suffered when they were allegedly shot or beaten by defendants' employees. All of the alleged shootings or beatings occurred in Iraq.

Named as defendants are eleven business entities, collectively referred to as "Xe defendants," and one individual, Erik Prince, who is alleged to be the owner and operator of the eleven Xe defendants.[2] The complaints allege that Xe defendants were retained by the United States Department of State to perform security services under contract in Iraq. The complaints further allege that certain plaintiffs were shot or beaten by defendants' employees.

For purposes of ruling on the motions at bar, it is important to summarize briefly the facts alleged with regard to each of the consolidated cases.

### A. No. 1:09cv615

Plaintiffs in No. 1:09cv615 are the estate, widow, and two surviving sons of Raheem Khalaf Sa'adoon. Prior to his death, Sa'adoon worked as a security guard for Iraqi Vice President Adel Abdul Mahdi. On December 24, 2006, Andrew Moonen was allegedly an employee of Blackwater, as it was then known.[3] On that day, Moonen attended a Christmas party allegedly attended by several of his Blackwater colleagues. He is said to have consumed an excessive amount of alcohol at the party and thereafter to have left in a state of visible

---

[2] Xe defendants are: Prince Group, EP Investments LLC, Greystone, Total Intelligence, The Prince Group LLC, Xe, Blackwater Worldwide, Blackwater Lodge and Training Center, Blackwater Target Systems, Blackwater Security Consulting, and Raven Development Group. In addition, plaintiffs in No. 1:09cv615 originally named Andrew Moonen, a former Blackwater employee, as a defendant. Plaintiffs have since settled with Moonen and voluntarily dismissed their claims against him.

[3] The entity formerly known as Blackwater now operates under the name Xe Services.

intoxication, armed with his Blackwater-issued Glock handgun. Moonen allegedly became lost and eventually came upon Sa'adoon, who was on guard duty. According to the complaint, Moonen then pulled out his Glock handgun and shot and killed Sa'adoon for no reason. Plaintiffs allege that defendants are liable for Sa'adoon's death. Plaintiffs also accuse Xe defendants of flying Moonen to the United States for the purposes of (i) evading prosecution by Iraqi authorities, and (ii) avoiding promised payments to Sa'adoon's widow.

**B. No. 1:09cv616**

In No. 1:09cv616, plaintiffs are the estates of Iraqi citizens Ali Hussamaldeen Ibrahim Albazzaz, Kadhum Kayiz Aziz, and Sa'ad Raheem Jarallah. Aziz worked as a security guard for the Iraqi government, while Jarallah was a schoolteacher. The complaint does not specify Albazzaz's occupation. Plaintiffs allege that defendants are liable for Albazzaz's, Aziz's, and Jarallah's deaths, which occurred on September 9, 2007, when unidentified Xe defendants' employees allegedly fired without justification into a crowd near Baghdad's Al Watahba Square.

**C. No. 1:09cv617**

In No. 1:09cv617, plaintiffs are twenty-two Baghdad residents and the estates of eight deceased former Baghdad residents. Plaintiffs' claims stem from an incident that occurred on September 16, 2007 in Baghdad's Nisoor Square. On that day, plaintiffs claim that Xe defendants' employees repeatedly fired automatic weapons and detonated grenades into a crowd without justification, thereby causing (i) the deaths of the eight plaintiffs whose estates brought this suit and (ii) the injuries of the remaining twenty-two plaintiffs.

**D. No. 1:09cv618**

In No. 1:09cv618, plaintiffs are nineteen Baghdad residents and the estates of six deceased former Baghdad residents. According to the complaint, the alleged deaths and injuries occurred in seven separate incidents between March 2005 and April 2008. In al seven incidents, plaintiffs allege that employees of Xe defendants shot or severely beat civilians without justification. Plaintiffs allege that defendants are liable for the deaths of the six decedents and the injuries of the other nineteen plaintiffs. In chronological order, plaintiffs allege:

- On March 22, 2005, Al Qaysi, Hikmat Ali Husein Al Rubae, and one other person were being driven to Baghdad from the Baghdad airport in Al Rubae's BMW automobile when, these plaintiffs allege, Al Qaysi was shot and killed for no reason by Xe defendants' employees. Al Rubae also alleges that Xe defendants' employees shot at him, wounding him and causing damage to his vehicle.

- Husam Hasan Jaber was a Baghdad taxicab operator who, on July 18, 2005, was driving a minibus carrying three passengers. Jaber alleges that Xe defendants' employees shot and wounded Jaber without justification. He further alleges that Xe defendants' employees used exploding ammunition designed to maximize the extent of the injury inflicted and the amount of damage caused. He also claims that Xe defendants' employees fled the scene despite knowing that he had been seriously wounded. Jaber further alleges that he suffered property damage to his minibus as a result of the incident.

- Maulood Mohammed Shathir Husein, a professor of veterinary medicine at the

-4-

University of Baghdad, claims that in August 2005, he was being driven to the Ministry of Higher Education in Baghdad when his car approached a U.S. military checkpoint. He alleges that vehicles operated by Xe defendants' employees approached the checkpoint at the same time, at which point the employees shot Husein in the leg. According to the complaint, the vehicles operated by Xe defendants' employees left the scene while American military personnel came to Husein's aid.

- Suhad Shakir Fadhil worked in media relations in Baghdad. Her estate alleges that on February 4, 2007, she was driving to her office located near the Iraqi Ministry of Foreign Affairs when Xe defendants' employees shot and killed her without justification. Her estate also alleges that Xe defendants' shooters severely damaged her car.

- On February 7, 2007, Xe defendants' employees shot and killed, without justification, three men—Sabah Salman Hassoon, Azhar Abdullah Ali, and Nibrass Mohammed Dawood—while the men were working as security guards at the Iraqi Media Network in Central Baghdad. Moreover, these plaintiffs claim that the incident was witnessed by twenty of Xe defendants' employees, and that Xe defendants failed to report the shooting, refused to identify the shooters, and destroyed evidence relating to the incident.

- On July 1, 2007, Xe defendants' employees shot at a minibus containing three families, including small children, for no reason. The shots killed a nine-year-old

boy, and wounded a three-month-old baby and the children's mother, father, uncle, and cousin. These plaintiffs allege that other family members in the minibus were also shot at and that they continue to suffer from emotional distress as a result of the incident.

- On April 26, 2008, Safeen Hameed Ahmed Qadir was a photographer covering the opening of a Ford automobile dealership in Iraq's Arbil province. During the event, Qadir attempted to photograph a visiting American dignitary who was being guarded by Xe defendants' employees. Qadir alleges that these employees severely beat him without justification.

**E. No. 1:09cv645**

Finally, in No. 1:09cv645, plaintiffs are Ali Kareem Fakhri and the estate of Husain Salih Rabea. Rabea was a seventy-two year old man whose occupation is not specified in the complaint. Fakhri was a student at Babylon University College of Biology. These plaintiffs allege that on August 13, 2007, Xe defendants' employees shot at Fakhri and Rabea for no reason, killing Rabea and causing severe emotional distress to Fakhri. They further allege that Xe defendants' employees fled the scene without offering medical aid.

The first four of these consolidated cases were filed on June 2, 2009, and No. 1:09cv645 was thereafter filed on June 10, 2009. On July 14, 2009, defendants moved to dismiss the cases, which were subsequently consolidated for purposes of discovery and pre-trial motions on July 17, 2009. Discovery was stayed pending resolution of defendants' motions. *See In re:*

-6-

*Blackwater Alien Tort Claims Act Litigation*, Nos. 1:09cv615, 1:09cv616, 1:09cv617, 1:09cv618, 1:09cv645 (E.D. Va. July 17, 2009) (Order). Oral argument was heard on August 28, 2009.

In all of the cases, plaintiffs accuse defendants of encouraging the killing of Iraqi civilians by fostering a corporate culture in which excessive use of deadly force is unpunished. Specifically, plaintiffs accuse defendants of employing and arming people whom they know to be alcoholics, drug users, or acting under the influence of chemical substances. Moreover, plaintiffs allege that defendants hire individuals known to have engaged in human rights abuses. They claim defendants captured illegal acts by their employees on videotape and subsequently destroyed those tapes. In addition, some plaintiffs claim that defendant Prince has engaged in a pattern of racketeering activities through the commission of illegal acts including murder, tax evasion, destruction of evidence, kidnaping, weapons smuggling, sexual exploitation of minors, and unlawful possession and distribution of controlled substances. These RICO plaintiffs claim they suffered property damage during the commission of the alleged predicate acts and through defendant Prince's alleged control and operation of a RICO enterprise. More specifically, the RICO plaintiffs allege that their vehicles were damaged or destroyed during the course of the killings, which are alleged to be the predicate racketeering acts committed by defendant Prince.

In all of the cases, plaintiffs seek recovery from defendants under the Alien Tort Statute, 28 U.S.C. § 1350, for injuries resulting from the alleged commission of war crimes. In two of the cases, Nos. 1:09cv617 and 1:09cv618, plaintiffs also claim that defendants are liable under the ATS for committing summary executions. In those same two cases, plaintiffs also allege that

defendants are civilly liable for RICO violations under 18 U.S.C. § 1964. Moreover, in all of the cases, plaintiffs assert that defendants are liable under nonfederal tort law for (i) assault and battery, (ii) wrongful death, (iii) intentional infliction of emotional distress, (iv) negligent infliction of emotional distress, (v) negligent hiring, training, and supervision, and (vi) tortious spoilation of evidence.

## II.

Defendants seek dismissal of all ATS claims on the grounds (i) that the ATS does not recognize claims of war crimes or summary executions, (ii) that ATS liability is limited to state actors, (iii) that the ATS does not recognize claims against corporations, (iv) that plaintiffs have not alleged facts in their complaints sufficient to create a plausible entitlement to relief under the ATS, and (v) that the ATS requires plaintiffs to exhaust their remedies in Iraqi courts before suing under the ATS in the United States. Defendants also argue that even assuming the claims are adequately stated, recovery of punitive damages is not allowed under the ATS. At issue, therefore, are the following questions:

(i) Whether the ATS recognizes causes of action for war crimes and summary executions;

(ii) Whether the ATS recognizes claims brought pursuant to these causes of action against private, non-state actors;

(iii) Whether ATS claims may proceed against corporate defendants;

(iv) Whether plaintiffs have validly stated claims alleging war crimes and summary executions upon which relief may be granted pursuant to the ATS;

(v) Whether plaintiffs must exhaust their remedies in Iraqi courts before they may litigate

their ATS claims here; and

      (vi) Whether punitive damages are available for ATS claims.

Analysis of plaintiffs' ATS claims properly begins with the statute itself, 28 U.S.C. §

1350. Enacted in 1789 as part of the first Judiciary Act, § 1350's brevity belies the magnitude of

its implications. Specifically, the ATS states, in its entirety, that

> [t]he district courts shall have original jurisdiction of any civil action by an alien
> for a tort only, committed in violation of the law of nations or a treaty of the
> United States.

28 U.S.C. § 1350. Perhaps because the phrase "law of nations" was considered to be lacking in

substance, the statute lay dormant for more than a century and a half. Indeed, so obscure was the

import of the ATS, which has been called a "legal Lohengrin" and the "Rip Van Winkle of

statutes,"[4] that it formed the basis for federal subject-matter jurisdiction in only one case during

its first 170 years of existence.[5] Then, in the 1960s, this statutory Rip Van Winkle awoke, and

plaintiffs began asserting ATS claims. These efforts met with varying success.[6] Indeed, ATS

---

    [4] *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975) (Friendly, J.) (referring to the ATS as a "legal Lohengrin"); Karen Lin, *An Unintended Double Standard of Liability: The Effect of the Westfall Act on the Alien Tort Claims Act*, 108 Colum. L. Rev. 1718, 1732 (2008) (calling the ATS the "Rip Van Winkle of statutes").

    [5] The sole case in which the ATS was found to confer jurisdiction was *Bolchos v. Darrel*, 3 F. Cas. 810 (D.S.C. 1795) (No. 1607), in which the district judge concluded that it had jurisdiction in admiralty *and* under the ATS to hear a suit for damages brought by a French privateer against the mortgagee of a captured slave ship. *Id.* at 810.

    [6] *See, e.g., Khedivial Line, S.A.E. v. Seafarers' Int'l Union*, 278 F.2d 49 (2d Cir. 1960) (finding no ATS jurisdiction for claim of violation of non-treaty right of access to ports); *Abdul-Rahman Omar Adra v. Clift*, 195 F. Supp. 857 (D. Md. 1961) (finding that the unlawful taking of custody over a child by one parent through fraudulent use of a foreign passport violates the law of nations within the meaning of the ATS); *IIT v. Vencap*, 519 F.2d 1001 (2d Cir. 1975) (holding that the Eighth Commandment is not part of the law of nations); *Filartiga v. Pena-Irala*, 630

jurisprudence during this period is best characterized by confusion and great uncertainty. Then, in 2004, the Supreme Court began to put this house in order when it decided *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

In *Sosa*, a Mexican national brought suit under the ATS after he was abducted in Mexico and brought to the United States for trial by a group of Mexican nationals hired by the U.S. Drug Enforcement Administration for that purpose. The plaintiff alleged that this conduct violated an international norm against arbitrary arrest and detention, and was thus actionable under the ATS. On these facts, the Supreme Court reversed the trial court's award of damages to the plaintiff. The parties hotly disputed whether the ATS, in addition to conferring subject-matter jurisdiction over certain claims to federal courts, created a substantive cause of action for violations of the law of nations. The Supreme Court answered the question, somewhat ambiguously, in the affirmative. Specifically, Justice Souter's majority opinion stated that while the ATS is "in its terms only jurisdictional," it also "enable[s] federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law."[7] 542 U.S. at 713.

---

F.2d 876 (2d Cir. 1980) (concluding that the ATS confers jurisdiction over tort claims for torture); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791–95 (D.C. Cir. 1984) (Edwards, J., concurring) (finding that torture by non-state actors does not violate the law of nations within the meaning of the ATS); *In re Estate of Marcos Human Rights Lit.*, 25 F.3d 1467 (9th Cir. 1994) (holding that actions against former Philippine president for torture, summary execution, and disappearance were cognizable under the ATS); *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (holding that genocide by non-state actor falls within ATS jurisdiction).

[7] Nevertheless, if the ATS were strictly jurisdictional, recognizing only existing common law causes of action, then the claims recognized under it would presumably also be cognizable under the other grants of jurisdiction to the federal courts. This, however, is not the case: no court has held that claims alleging violations of the law of nations are cognizable under other grants of subject-matter jurisdiction in the absence of ATS jurisdiction. Thus, irrespective of the statute's terms, *Sosa* is best read to conclude that the ATS is not strictly jurisdictional. *See* Curtis

According to the *Sosa* majority, the ATS recognizes claims alleging violations of binding customary international norms with no "less definite content and acceptance among civilized nations" today than the historical paradigms of offenses against ambassadors, violations of safe conduct, and piracy had at the time of the ATS's enactment in 1789. *Id.* at 732. Applying this principle to the facts presented, the *Sosa* majority consulted a variety of sources,[8] concluding ultimately that the ATS did not confer jurisdiction over the plaintiff's claim. *Id.* at 736–38. In reaching this result, the majority found that while various international treatises and resolutions condemned arbitrary arrest and detention as contrary to universal human rights, such declarations did not create a *specific* norm with *binding* effect, but rather only stated broad, nonbinding principles at a "high level of generality." *Id.* at 736 n.27; *see also id.* at 732 (citing *United States v. Smith*, 5 Wheat. 153, 163–80 (1820)) (emphasizing specificity with which piracy was defined by law of nations). In other words, the *Sosa* majority found that there was insufficient agreement among nations as to the *precise* conduct that would constitute a violation of an *enforceable* rule against arbitrary arrest and detention. Thus, while *Sosa* interprets the ATS to confer upon federal courts limited discretion to recognize new causes of action for violations of the law of nations, it also holds that arbitrary arrest and detention are not among the causes of action cognizable under the statute.

---

A. Bradley, Jack L. Goldsmith & David H. Moore, Sosa, *Customary International Law, and the Continuing Relevance of* Erie, 120 Harv. L. Rev. 869, 892 (2007) ("If modern position proponents are correct about *Sosa*, and [customary international law] automatically has the status of federal law, CIL would provide a basis for federal question jurisdiction.").

  [8] These sources included the Restatement (Third) of Foreign Relations Law of the United States, Brownlie's treatise on public international law, cases of the International Court of Justice, and an academic survey of the laws of various nations. *See* 542 U.S. at 736 n.27, 737.

Importantly, *Sosa* counsels the federal courts to engage in "vigilant doorkeeping" when determining whether to recognize a cause of action under the ATS for five reasons, each of which relates to the need for judicial restraint in importing international norms (if such exist) into American law in the absence of explicit legislative authorization or guidance. 542 U.S. at 729. First, *Sosa* explains that the common law is no longer understood, as it was at the time of the ATS's enactment, to be a "'transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute.'" *Id.* at 725 (quoting *Black and White Taxicab & Transfer Co. v. Brown and Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 533 (1928) (Holmes, J., dissenting)). Instead, it is now recognized that "the law is not so much found or discovered as it is either made or created," and that reliance on international norms for the generation of a new common law cause of action would require "a substantial element of discretionary judgment." *Id.* at 725–26. Accordingly, *Sosa* suggests that just as the understanding of the role of common law has changed, so should courts' willingness to look to international norms to determine the content of that common law. Second, *Sosa* notes that the Supreme Court's watershed decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), denied the existence of any federal "general" common law, thus emphasizing the importance of "look[ing] for legislative guidance before exercising innovative authority over substantive law." *Sosa*, 542 U.S. at 726. Third, *Sosa* teaches that recent Supreme Court decisions evince a reluctance to infer the existence of an implied federal cause of action where the statute does not explicitly create a cause of action. *Id.* at 727 (citing *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001)). Fourth, *Sosa* suggests

-12-

that courts should impose a "high bar" in creating new private causes of action for violations of international law norms because of the risk of "impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* Finally, *Sosa* notes that Congress has repeatedly declined to provide the courts with a "mandate to seek out and define new and debatable violations of the law of nations." *Id.*

It is clear, then, that *Sosa* does not incorporate customary international law ("CIL") into the body of federal common law in a wholesale manner. Indeed, *Sosa* directs the federal courts to consider carefully the "practical consequences of making [a] cause of action available to litigants in the federal courts." 542 U.S. at 729, 732–33. If, as some commentators suggest, federal common law automatically incorporates CIL,[9] then such considerations would be entirely inapposite. *See* Curtis A. Bradley, Jack L. Goldsmith & David H. Moore, Sosa, *Customary International Law, and the Continuing Relevance of* Erie, 120 Harv. L. Rev. 869, 892 (2007) (hereinafter Bradley, et al., 2007) (concluding that the analysis prescribed by *Sosa* is inconsistent with the view that CIL is an inherent part of federal common law); Gerald L. Neuman, *The Abiding Significance of Law in Foreign Relations*, 2004 Sup. Ct. Rev. 111, 130 (same). Put another way, if CIL were an inherent component of federal common law, there would be no

---

[9] *See, e.g.,* Martin S. Flaherty, *The Future and Past of U.S. Foreign Relations Law*, 67 Law & Contemp. Probs. 169, 173 (2004) (concluding that *Sosa* "confirm[s] that international custom was part of judicially enforceable federal law even in the absence of a statute"); Ralph G. Steinhardt, *Laying One Bankrupt Critique to Rest:* Sosa v. Alvarez-Machain *and the Future of International Human Rights Litigation in U.S. Courts*, 57 Vand. L. Rev. 2241, 2259 (2004) ("[CIL] remains an area in which no affirmative legislative act is required to 'authorize' its application in U.S. courts."); *The Supreme Court, 2003 Term—Leading Cases*, 118 Harv. L. Rev. 226, 453 (2004) (reading *Sosa* to indicate that "all customary international law has been included within federal common law").

occasion for the federal courts to exercise their "vigilant doorkeeping" duty as envisaged by the *Sosa* majority.[10]

Moreover, *Sosa* affirms the well-settled rule that when Congress defines the relevant norms of international law by legislative enactment, courts are bound by that determination. Specifically, *Sosa* quotes, with approval, the traditional pre-*Erie* formulation that

> *where there is no treaty, and no controlling executive or legislative act or judicial decision*, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat.

542 U.S. at 734 (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)) (emphasis added).[11]

---

[10] In addition to being inconsistent with *Sosa*, wholesale incorporation of CIL into federal common law would raise a significant constitutional problem. Specifically, it would represent an unconstitutional delegation of federal lawmaking power to foreign persons or entities not constitutionally competent or authorized to exercise that important power. *See* Michael Stokes Paulsen, *The Constitutional Power to Interpret International Law*, 118 Yale L.J. 1762, 1806 (2009) ("[T]he power to interpret, apply, and enforce international law *for the United States* . . . is not possessed by, and cannot authoritatively be exercised by, non-U.S. actors."); *Cf. Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 2 (1825) (unconstitutional delegation of federal lawmaking power to state legislatures avoided by construing federal statute not to incorporate post-enactment state legislation). *See generally* John O. McGinnis, Medellin *and the Future of International Delegation*, 118 Yale L.J. 1712 (2009) (identifying problem of international delegations and analyzing potential constitutional limitations);

It is important to note, however, that it is far from clear that the *Sosa* majority adequately addressed the risk of unconstitutional delegation of lawmaking power. To be sure, the *Sosa* majority's careful attempt to cabin the phrase "law of nations," and its salute to the "vigilant doorkeeping" duty of federal courts, may partially address this issue. But in the end, whether the unconstitutional delegation problem is avoided will depend on the wisdom and restraint of federal judges and Justices. It goes without saying that the Founders and members of the Congress that passed the ATS would have been surprised, and indeed dismayed, to learn that the ATS could be used as a vehicle for directly and unconstitutionally incorporating into American law principles and notions from the amorphous body of CIL.

[11] *See also* Paulsen, *supra* note 10, at 1803 ("[E]ven under the strongest reading of the force of customary international law, it may always be displaced . . . by any official action within

-14-

Moreover, as *Sosa* notes, *Erie* and cases since then have further reduced federal courts' discretion to create new federal common law in the absence of legislative guidance. *Id.* at 726–27. Accordingly, reference to secondary sources to define the "law of nations" is appropriate only insofar as Congress has not itself defined the relevant norms.

Three cases decided by the Supreme Court since *Sosa* emphasize the power of Congress and the courts to declare, authoritatively, the content of international law for the United States. In *Hamdan v. Rumsfeld*, 548 U.S. 557, 625–35 (2006), trial procedures for a Guantanamo Bay detainee were found to violate the Uniform Code of Military Justice ("UCMJ"). The relevant provision of the UCMJ conditioned the military commission's authority on compliance with the "law of war." 10 U.S.C. § 821. *Hamdan* held that the petitioner had an enforceable right to challenge the trial procedures as contrary to the Geneva Conventions because Congress had implicitly incorporated the treaty's provisions into the authorizing statute by referring to the law of war.[12] 548 U.S. at 625–35. In other words, when one act of Congress (the UCMJ) referred generically to a body of international law (the law of war), *Hamdan* incorporated the norms of international law provided by Congress in the Geneva Conventions.

---

the constitutional powers of the federal government. The opinion in *The Paquete Habana* is explicit on the point, and the Supreme Court has never suggested anything to the contrary."); Neuman, *The Abiding Significance of Law in Foreign Relations*, 2004 Sup. Ct. Rev. 111, 132 ("Where Congress has not provided explicit direction, courts ease the interaction between the domestic and international legal systems by recognizing and incorporating international norms, to the extent that they can be harmonized with other federal law.").

[12] A concurrence, written by Justice Kennedy and joined by three other Justices, focused even more explicitly on Congress's affirmative steps to define the law of war through ratification of the Geneva Conventions and the War Crimes Act of 1996, discussed *infra*. 548 U.S. at 642–43 (Kennedy, J., concurring); *see* Bradley et al., 2007, at 931–32 (discussing post-*Sosa* emphasis on finding legislative incorporation of international law as exemplified in *Hamdan*).

Moreover, it is clear that federal courts are to interpret international treaties ratified by Congress in much the same way they interpret any other act of Congress, namely by determining congressional intent through careful examination of the text of the enactment. In *Sanchez-Llamas v. Oregon*, a case involving the scope of foreign nationals' rights to consular communication under the Vienna Convention on Consular Relations ("VCCR"), the Supreme Court concluded that the International Court of Justice's ("ICJ") interpretation of the VCCR deserved "respectful consideration," but did not compel reconsideration of prior Supreme Court decisions interpreting the VCCR that contradicted the ICJ's conclusion. 548 U.S. 331, 333 (2006). In other words, the final determination of the content of the international treaty belonged to U.S. courts, not an international tribunal. *Id.* at 353 (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). Finally, in *Medellin v. Texas*, 128 S. Ct. 1346, 1360 (2008), at issue was the state's failure to inform Mexican nationals on death row of their consular notification rights under the VCCR. The ICJ ruled that this failure constituted a violation of the VCCR. Yet, the Supreme Court held that the ICJ's determination was not "automatically enforceable federal law." *Id.* In so holding, the Supreme Court emphasized that whether treaties are self-executing is a question of U.S. law for the courts of the United States to decide, and the analysis proceeds, as usual, through determination of congressional intent through examination of the treaty's text.[13] *Id.* at 1364–65. In summary, these cases support the proposition that when Congress has defined the relevant international legal norms, federal courts must follow Congress's lead. And, where

---

[13] It is worth noting that *Medellin* also held that the President of the United States lacked the power to convert, by order, the ICJ's ruling into a binding federal rule of decision because the Constitution vests such authority exclusively in Congress. 128 S. Ct. at 1368–69.

Congress has not spoken on the content of international law, U.S. courts must define the applicable legal norms independently of the determinations of international tribunals and foreign bodies, but they may accord those determinations an appropriate level of "respectful consideration." *Sanchez-Llamas*, 548 U.S. at 333.

Thus, although *Sosa* permits the assertion of claims for violations of the "law of nations," the case sets a high bar for causes of action to clear in order to be cognizable under the ATS. To constitute an actionable violation of the "law of nations" within the meaning of the ATS, plaintiffs must allege violations of international law norms that (i) are universally recognized, (ii) have specific definition and content, and (iii) are binding and enforceable, rather than merely aspirational. Moreover, federal courts must examine whether Congress has itself defined the relevant international law norm by legislative enactment; if so, federal courts are bound by that determination. Only in cases where Congress has not spoken on the content of the law of nations is it appropriate for federal courts to consider the conclusions contained in the decisions of international tribunals and in widely-accepted treatises of international law. Yet, even then they must do so carefully because of (i) the potentially serious practical consequences of recognizing such a cause of action, and (ii) the modern understanding of the limited discretion of federal courts to create new federal common law causes of action in the absence of clear legislative guidance. These principles and *Sosa*'s norm-specific analysis govern plaintiffs' war crimes and summary execution claims.

## A. War Crimes Claims

Claims for violations of the international norm proscribing war crimes are cognizable

-17-

under the ATS. By ratifying the Geneva Conventions, Congress has adopted a precise,

universally accepted definition of war crimes. Moreover, through enactment of a separate federal

statute, Congress has incorporated this precise definition into the federal criminal law. 18 U.S.C.

§ 2441. Thus, Congress has clearly defined the law of nations to include a binding prohibition on

the commission of war crimes. Given this, and given *Sosa*'s teachings, it follows that an

allegation of a war crime states a cause of action under the ATS.

Specifically, it is a "grave breach" of the Fourth Geneva Convention intentionally to kill

or inflict serious bodily injury upon innocent civilians during the course of an armed conflict.[14]

The treaty has been ratified by the United States and every other nation in the world. *See* U.S.

Dep't of State, *Treaties in Force* 435–37 (2009). Thus, every country in the world, including the

United States, has agreed to precisely the same definition of war crimes.[15] Moreover, this

---

[14] The Fourth Geneva Convention, which concerns the protection of civilians during armed conflicts of an international character, deems a "grave breach" of the Convention acts against "protected persons" consisting of "willful killing, torture or inhuman treatment, including biological experiments, [or] wilfully causing great suffering or serious injury to body or health." Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, art. 147 [hereinafter Fourth Geneva Convention]. Moreover, protected persons are "those who, at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power." *Id.* art. 4. The "in the hands of" language is interpreted extremely broadly, and includes any time that a civilian is in territory controlled by a party to the conflict. *See* Jean S. Pictet, *Commentary on Geneva Convention Relative to the Protection of Civilian Persons in Time of War* 46–47 (1958). Indeed, in a 2004 memorandum, the Office of Legal Counsel of the U.S. Department of Justice opined that all noncombatant Iraqi nationals qualified as protected persons under the Fourth Geneva Convention. *See* Jack L. Goldsmith III, *"Protected Person" Status in Occupied Iraq Under the Fourth Geneva Convention* 5–7 (2004), *available at* http://www.usdoj.gov/olc/2004/gc4mar18.pdf.

[15] Compare *Sosa*, in which the Supreme Court majority concluded that various national prohibitions on arbitrary detention demonstrated that such an international norm existed, but that differences in these state laws indicated that "the consensus is at a high level of generality."

specific universal norm is binding on nationals of the vast majority of nations in the world. Indeed, nationals of 110 states—including Australia, Canada, Japan, Mexico, and all of Western Europe—are criminally punishable in the International Criminal Court (ICC) for precisely these grave breaches as defined in the Geneva Conventions. Furthermore, many of the countries that have not ratified the treaty establishing the ICC have nonetheless passed laws criminally punishing grave breaches of the Geneva Conventions in their own courts.[16] Importantly, the United States is among this group of countries, having incorporated the Geneva Conventions into its domestic criminal law through the War Crimes Act of 1996, which criminalizes grave breaches of the Conventions committed by or against a national of the United States. 18 U.S.C. § 2441. Thus, Congress has directly and explicitly stated that the Geneva Conventions contain the binding international norms that govern the definition of war crimes in federal courts. *See Hamdan*, 548 U.S. at 642 (Kennedy, J., concurring) (concluding that by ratifying the Geneva Conventions and enacting the War Crimes Act of 1996 Congress has with "no doubt" defined the law of war by the content of the Geneva Conventions). Accordingly, applying the principles of *Sosa*, the ATS confers subject-matter jurisdiction over properly stated claims of war crimes.[17]

---

*Sosa*, 542 U.S. at 736 n.27. This is not true where, as here, all of the nations of the world agree to precisely the same language in the course of defining a grave breach of international law.

[16] For an exhaustive list of laws and regulations enacted by states to enforce international human rights law, *see* International Committee of the Red Cross, *International Humanitarian Law—National Implementation*, at http://www.icrc.org/ihl-nat.nsf/.

[17] While the Court of Appeals for the Fourth Circuit has yet to confront the question, all of the circuit courts to have considered the issue post-*Sosa* have reached this same conclusion. *See Sinaltrainal v. Coca-Cola Co.*, No. 06-15851, 2009 WL 2431463, at *9 (11th Cir. Aug. 11, 2009) (recognizing ATS claims of war crimes); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 175–87 (2d Cir. 2009) (citing *Kadic v. Karadzic*, 70 F.3d 232, 240 (2d Cir. 1995)) (concluding that

Defendants argue that even assuming that war crimes claims are cognizable under the ATS, such claims are not cognizable against defendants. In this regard, defendants first contend that as a general rule, the ATS only recognizes claims against state actors. Yet, it is quite clear that the language of the ATS is not self-limiting to claims against state actors. Thus, defendants' argument may have merit only insofar as it is supported by *Sosa* or by recognized norms of international law. It is supported by neither.

Indeed, *Sosa* explicitly acknowledges the existence of a developing consensus that non-state actors may violate certain norms as defined by the law of nations. Because *Sosa* clearly indicates that the reach of ATS liability to non-state actors should be determined with regard to the specific norm alleged to have been violated, it is clear that there is no *per se* rule that the ATS does not reach private actors. In particular, footnote 20 of *Sosa*, which defendants cite in support of their argument, comments that

> [a] related consideration [to the determination of whether a norm is sufficiently definite to support an ATS cause of action] is whether international law extends the scope of liability for a violation *of a given norm* to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. Compare *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791–95 (D.C. Cir. 1984) (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), with *Kadic v. Karadzic*, 70 F.3d 232, 239–41 (2d Cir. 1995) (sufficient consensus in 1995 that genocide by private actors violates international law).

*Id.* (emphasis added). Contrary to defendants' argument, this language makes clear that the

---

medical experimentation on nonconsenting human subjects is a sufficiently universal and definite norm to be covered by the ATS); *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1202 (9th Cir. 2007) (rev'd in part *en banc* on other grounds) (allowing war crimes claims to proceed under the ATS, noting that such claims "form the least controversial core of modern day [ATS] jurisdiction").

analysis for non-state actor liability is norm-specific. Moreover, the parenthetical explanations of the citations to *Tel-Oren* and *Kadic*, emphasizing the eleven-year gap between the two decisions and the distinct claims alleged—torture in *Tel-Oren* and genocide in *Kadic*—suggest that a consensus may now exist that at least some ATS claims reach non-state actors.[18] Thus, there is no support for defendants' argument that ATS claims, as a general matter, are cognizable only against state actors. Nevertheless, the question remains whether war crimes claims, in particular, are cognizable against private actors. They clearly are.

The relevant provisions of the Geneva Conventions and their incorporating federal criminal statute, the War Crimes Act, clearly do not, by their terms, limit their applicability to state actors. While other prohibitions contained within the Geneva Conventions, such as the ban on summary executions, discussed *infra*, require that the conduct be committed by a party to the armed conflict, there is no such requirement for grave breaches such as the murder of protected persons.[19] Instead, the grave breach is defined in terms of the status of the victim, *not* the status

_____

[18] It is worth noting that the two opinions cited in *Sosa*'s footnote 20 are consistent with one another. *Tel-Oren* acknowledges that private actors are liable for some violations, just not torture, and *Kadic* in fact requires state actors for torture and summary execution claims, but not for genocide and war crimes. *See Tel-Oren*, 726 F.2d at 795; *Kadic*, 70 F.3d at 244–45. Indeed, Judge Edwards's *Tel-Oren* opinion, cited in *Sosa*, acknowledges an emerging consensus that CIL reaches non-state actors, and merely concludes that there was not yet, in 1984, sufficient consensus that torture was "among the handful of crimes to which the law of nations attributes individual responsibility." 726 F.2d at 795. A recent D.C. Circuit opinion, which defendants cite, also supports this conclusion. *Saleh v. Titan Corp.*, No. 08-7008, slip. op. at 28 n.13 (D.C. Cir. Sept. 11, 2009) (dismissing torture claims on state actor grounds, but assuming without deciding that war crimes claims may be cognizable against non-state actors) ("Even if torture suits cannot be brought against private parties—at least not yet—it may be that 'war crimes' have a broader reach.").

[19] Defendants cite *Kadic* as requiring that the conduct be performed by a party to the conflict. Defs.' Mots. to Dism. at 11 (citing *Kadic*, 70 F.3d at 242–43). *Kadic*, in turn, derives

of the perpetrator. *See* Fourth Geneva Convention art. 146 ("Grave breaches . . . shall be those involving any of the following acts, if committed against persons or property protected by the present Convention."). Indeed, the War Crimes Act, in codifying the Geneva Conventions' "grave breach" provisions into federal criminal law, subjects all United States nationals to liability with no reference to color of law or status as a party to the armed conflict. *See* 18 U.S.C. § 2441(b).[20] Accordingly, the courts of appeals to consider the question since *Kadic* have recognized that ATS war crimes claims are cognizable against non-state actors. *See Sinaltrainal v. Coca-Cola Co.*, No. 06-15851, 2009 WL 2431463, at *10 (11th Cir. Aug. 11, 2009) ("[W]ar crimes . . . negate the need for state action."); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 173 (2d Cir. 2009) ("ATS claims may sometimes be brought against private actors . . . when the tortious activities violate norms of universal concern that are recognized to extend to the conduct of private parties—for example, slavery, genocide, and war crimes" (internal quotation marks omitted).); *Doe I v. Unocal Corp.*, 395 F.3d 932, 945–46 (9th Cir. 2002) ("[C]rimes like slave trading, genocide or war crimes . . . by themselves do not require state action for [ATS] liability to attach."). Thus, defendants offer no basis to conclude that war crimes claims under the ATS are cognizable only against state actors.

Defendants further argue that conduct constitutes a war crime only if it is perpetrated in

---

the language from Common Article 3 of the Geneva Conventions, which applies to armed conflicts *not* of an international character. Because the conduct at issue here allegedly occurred during an armed conflict of an international character, the "party to the conflict" language of Common Article 3 is inapposite.

[20] Moreover, as plaintiffs note, U.S. Department of Defense regulations also require contractors operating in foreign countries to notify their employees that they are subject to criminal liability under the War Crimes Act. *See* 48 C.F.R. § 252.225-7040(e)(2)(ii) (2009).

furtherance of a "military objective" rather than for economic or ideological reasons. Although this argument sweeps too broadly, it is true, as defendants suggest, that plaintiffs must allege a nexus to the armed conflict in order to state a valid claim for war crimes under the ATS. Accordingly, in order to state a valid claim for war crimes, plaintiffs must allege that the conduct constituting war crimes occurred in the context of and in association with an ongoing armed conflict.

No doubt, a more substantial relationship must exist between the armed conflict and the alleged conduct than the mere fact that the conduct occurred while an armed conflict was ongoing. Otherwise, the ATS would create a cause of action in federal court for any murder committed anywhere in the world as long as (i) there was an armed conflict happening in the country at the time and (ii) the murder victim was not a national of the United States. Allowing all such claims would swing open U.S. courthouse doors to plaintiffs alleging conduct far short of being one of a "'handful of heinous acts—each of which violates definable, universal, and obligatory norms.'" *Sosa*, 542 U.S. at 732 (quoting *Tel-Oren*, 726 F.2d at 781). Thus, the duty of "vigilant doorkeeping" that *Sosa* assigns federal courts requires that there exist a substantial nexus between the armed conflict and the alleged conduct constituting war crimes. *Id.* at 729.

Indeed, courts have generally required such a nexus. The Second Circuit in *Kadic* required that acts be "committed in the course of hostilities" in order to constitute a war crime. 70 F.3d at 242. Similarly, the Eleventh Circuit, citing *Kadic*, recently held that alleged war crimes must occur "during the course" of the armed conflict, clarifying that such a showing would require that the conduct occurred "because of" or "in the course of" the conflict.

-23-

*Sinaltrainal*, 2009 WL 2431463, at *10. In *Sinaltrainal*, Colombian nationals alleged that the

defendant corporations hired paramilitaries to torture and murder leaders of a trade union in order

to eliminate the union's presence at the corporations. A civil war was raging in Colombia at the

time, and plaintiffs argued that defendants were able to resort to such openly violent means

precisely because of the ongoing armed conflict. The Eleventh Circuit concluded that this

relationship between the conflict and the alleged conduct was insufficient. Indeed, a rule

allowing those claims would have allowed war crimes claims whenever an ongoing armed

conflict contributed substantially to the alleged perpetrator's ability to carry out the unlawful

acts, and because armed conflicts, by their nature, increase the degree of disorder in a country,

this requirement would normally be met.

Nor are these decisions the only support for a nexus requirement. Congress and the

Executive Branch have also adopted a nexus requirement in defining war crimes in related

contexts. Specifically, for conduct committed during a non-international armed conflict to

constitute a war crime punishable pursuant to federal criminal law, Congress requires that the

conduct occur "in the context of and in association with" the armed conflict.[21] 18 U.S.C. §

2441(c)(3), *amended by* Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2633

(2006). Similarly, the Secretary of Defense requires that the willful murder of protected persons

---

[21] It should be noted that this provision only governs criminal prosecutions for alleged violations of Common Article 3 of the Geneva Conventions for conduct arising during a non-international armed conflict. Because the claims in these cases do not allege violations of Common Article 3 and did not arise during a non-international armed conflict, the nexus requirement of the War Crimes Act would not directly apply in a criminal prosecution for the conduct alleged here. The Military Commissions Act of 2006 did not modify any other sections of the War Crimes Act.

by enemy combatants "took place in the context of and was associated with armed conflict" in order to constitute violations of the law of war triable before military commissions. 32 C.F.R. § 11.6(a)(1)(i) (2009).[22] Thus, the Legislative and Executive Branches have defined the law of nations to require a nexus of context and association to the armed conflict in order for conduct to constitute a war crime. Moreover, adopting the nexus requirement here serves to limit the scope of the ATS consistent with *Sosa*'s concern for the "possible collateral consequences of making international rules privately actionable." 542 U.S. at 727.

Instead of the context and association requirement adopted here, plaintiffs propose a rule that the conduct must be "'shaped by or dependent upon the environment—the armed conflict—in which it is committed.'" Pl.'s Mem. in Resp. at 36 n.12 (quoting *Prosecutor v.*

---

[22] This regulation further defines the context and association element to require a nexus that

> could involve, but is not limited to, time, location, or purpose of the conduct in relation to the armed hostilities. . . . This element does not require a declaration of war, ongoing mutual hostilities, or confrontation involving a regular national armed force. A single hostile act or attempted act may provide sufficient basis for the nexus so long as its magnitude or severity rises to the level of an "armed attack" or an "act of war," or the number, power, stated intent or organization of the force with which the actor is associated is such that the act or attempted act is tantamount to an attack by an armed force. Similarly, conduct undertaken or organized with knowledge or intent that it initiate or contribute to such hostile act or hostilities would satisfy the nexus requirement.

32 C.F.R. § 11.5(c) (2009). It is worth noting that the Military Commissions Act of 2006 authorizes military commissions for murders, committed by enemy combatants, of persons protected pursuant to the Geneva Conventions without any reference to a nexus requirement. 10 U.S.C. § 950v(b)(1). Nevertheless, the 2007 Manual for Military Commissions, issued by the Secretary of Defense to implement the Military Commissions Act, reiterates the required context and association element for the murder of protected persons. U.S. Dep't of Defense, *Manual for Military Commissions*, at IV-3 (2007).

*Kunarac*, Nos. IT-96-23 ¶ 58 (Int'l Crim. Trib. for the Former Yugoslavia June 12, 2002)). This argument is unpersuasive. Adopting this amorphous standard would keep few—if any—ATS claims from coming through federal courthouse doors. Indeed, interpreting the ATS to recognize any war crimes claim for conduct that was "shaped" by the environment of the armed conflict would have the consequence of allowing nearly any claim alleging murder when the perpetrator, for reasons unrelated to the conflict, merely takes advantage of the civil disorder that invariably accompanies an armed conflict.

While plaintiffs' proposed rule is overbroad, defendants' is too narrow. Defendants would require that the conduct allegedly constituting a war crime be committed in direct furtherance of a "military objective." Under this standard, an ATS action would not lie where defendants were motivated by ideology or the prospect of financial gain, as plaintiffs allege here. Indeed, under defendants' proposed rule, it is arguable that nobody who receives a paycheck would ever be liable for war crimes. Moreover, so narrow is the scope of this standard that it would exclude murders of civilians committed by soldiers where there was no legitimate "military objective" for committing the murders. It is true that acting with a purpose related to the objectives of the armed conflict is evidence of the alleged conduct's association with the armed conflict. But purpose cannot be the only factor to consider, nor can it be defined as narrowly as defendants propose. Other factors such as temporal and geographic proximity to the armed conflict, the nature of the conduct, and the identity of the victims must also be considered. Thus, some nexus must be shown between the conduct and the armed conflict. Accordingly, to state a valid ATS claim for murder or infliction of bodily injury as a war crime, plaintiffs must

plead that the alleged conduct was perpetrated in the context of, and in association with, the armed conflict.

Defendants next argue that the ATS does not permit a claim to proceed on a theory of vicarious liability against a corporation. Plaintiffs respond that they do not allege a theory of vicarious liability for their ATS claims. Rather, they allege that Xe defendants, acting as "alter egos" of defendant Prince, are directly liable for the commission of war crimes. Pl.'s Mem. in Resp. at 44–45; Hearing on Defs.' Mots. to Dism. Tr. at 40–41.[23] Accordingly, there is no need here to reach the question whether a corporation may be held vicariously liable for the war crimes of its employees.

Defendants also argue that corporations can never be held liable under the ATS. This argument is unavailing. Nothing in the ATS or *Sosa* may plausibly be read to distinguish between private individuals and corporations; indeed, *Sosa* simply refers to both individuals and entities as "private actors." 542 U.S. at 732 n.20. Moreover, there is no identifiable principle of civil liability which would distinguish between individual and corporate defendants in these circumstances. While it is true, as defendants note, that criminal liability for war crimes is

---

[23] During the course of the hearing on defendants' motions to dismiss, plaintiffs, by counsel, explicitly disclaimed any theory of vicarious liability under the ATS:

> THE COURT: Do you allege vicarious liability?

> MS. BURKE: No, Your Honor. What we are alleging is that the person who is responsible for these deaths is Mr. Prince and that he has set up a series of shells to give the appearance that there are these companies but that they do not have their own corporate weight.

Hearing on Defs.' Mots. to Dism. Tr. at 40–41.

generally limited to private individuals, it is also true that a "private corporation is a juridical

person and has no *per se* immunity under U.S. domestic or international law." *Presbyterian*

*Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 319 (S.D.N.Y. 2003).

Accordingly, all courts to have considered the question have concluded that "the issue of whether

corporations may be held liable under the [ATS is] indistinguishable from the question of

whether private individuals may be."[24] *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 282

(2d Cir. 2007) (Katzmann, J., concurring with *per curiam* opinion, joined by Hall, J.); *see*

*Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009); *Romero v. Drummond Co.*, 552 F.3d 1303,

1314–16 (11th Cir. 2008); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp.

2d 331, 336 n.10 (S.D.N.Y. 2005) ("[T]here is no principled basis for contending that acts such

as genocide are of mutual and not merely several concern to states when the acts are performed

by some private actors, like individuals, but not by other private actors, like corporations"

(citations omitted).); *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 58–59 (E.D.N.Y.

2005) ("Limiting civil liability to individuals while exonerating the corporation directing the

individual's action through its complex operations and changing personnel makes little sense in

---

[24] Defendants note that the Second Circuit's recent decision in *Presbyterian Church of Sudan v. Talisman Energy, Inc.* assumes without deciding that corporations may be held liable under the ATS for aiding and abetting in the commission of genocide, war crimes, and crimes against humanity. 2009 WL 3151804 (2d Cir. Oct. 2, 2009). In that case, the Second Circuit affirmed the district court's grant of summary judgment for the defendants because the evidence did not support the requisite elements to prove aiding and abetting liability pursuant to the law of nations. Accordingly, the Second Circuit did not need to address the question of whether the ATS allowed aiding and abetting claims against corporations. In any event, that is not the question at issue here. The Second Circuit's decision is entirely inapposite to the question of whether defendants in these cases may be held directly liable for war crimes under the ATS.

today's world."). Accordingly, claims alleging direct corporate liability for war crimes are cognizable under the ATS.

In sum, Congress, by ratifying the Geneva Conventions and by enacting the War Crimes Act, has defined the international law norm governing war crimes. This norm is binding, universal, and precisely defined. Accordingly, the ATS recognizes a cause of action alleging war crimes, and claims arising under this cause of action are cognizable against non-state actor defendants, including corporations. This cause of action requires plaintiffs to show that defendants (i) intentionally (ii) killed or inflicted serious bodily harm (iii) upon innocent civilians (iv) during an armed conflict and (v) in the context of and in association with that armed conflict. The analysis next turns to whether plaintiffs have properly stated a claim for relief under this cause of action.

For ATS claims alleging a cause of action for violations of the law of nations, the analysis pursuant to Rule 12(b)(1), Fed. R. Civ. P., is merged with that of whether plaintiffs have properly stated a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P. In other words, if plaintiffs have failed to state a claim validly alleging a violation of the law of nations within the meaning of the ATS, then federal subject-matter jurisdiction under the ATS is lacking. *See Sinaltrainal*, 2009 WL 2431463, at *13 (dismissing ATS claims for lack of subject-matter jurisdiction due to failure to allege facts creating plausible entitlement to relief).

The Supreme Court recently declared that threshold dismissal for failure to state a valid claim must be granted unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It follows that a

complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Id.* at 1949. And in this respect, it is also true that "the tenet that a court must accept

as true all of the allegations contained in a complaint is inapplicable to *legal* conclusions." *Id.*

(emphasis added). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Id.*, *quoted in Walker v. Prince George's County,*

*Md.*, No. 08-1462, 2009 WL 2343614, at *5 (4th Cir. July 30, 2009) (O'Connor, J.). Justice

Kennedy succinctly summarized these principles by noting that

> a court considering a motion to dismiss can choose to begin by identifying
> pleadings that, because they are no more than conclusions, are not entitled to the
> assumption of truth. While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations. When there are well-
> pleaded factual allegations, a court should assume their veracity and then
> determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 129 S. Ct. at 1950. Moreover, *Iqbal* reinforced the axiom that in ruling on threshold

motions to dismiss for failure to state a claim, courts should consider only the factual allegations

made in the complaint itself.[25] *See, e.g., id.* at 1949–54 (emphasizing repeatedly that factual

content of the complaint controls the 12(b)(6) ruling).

Accordingly, plaintiffs must allege facts in their complaints that give rise to a plausible

entitlement to relief for claims alleging war crimes pursuant to the ATS. In other words, the facts

alleged in the complaint, assumed to be true, must create a plausible inference that each of the

---

[25] A narrow exception applies to materials that are integral to the complaint and appended
thereto. *See generally* 5A Wright & Miller § 1327. No such materials were appended to the
complaints in these cases.

elements required to state a claim for war crimes under the ATS is met. *See id.* at 1937. Thus, in

order to prevail on defendants' motions, the complaints must state facts that would allow a trier

of fact plausibly to infer that defendant Prince (i) intentionally (ii) killed or inflicted serious

bodily harm (iii) on innocent civilians (iv) during an armed conflict and (v) in the context of and

in association with that armed conflict.   Plaintiffs have failed to meet this burden as to the ATS

war crimes claims in each of the five cases.

In this respect it must be noted at the outset that the content of all the complaints

contained within the sections entitled "Count One – War Crimes" is not entitled to the

presumption of truth normally afforded a complaint's factual allegations on a motion to dismiss.

Those sections do not contain factual allegations, but instead offer only "threadbare recitals of a

cause of action's elements, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1940

(quoting *Twombly*, 550 U.S. at 555).  Specifically, this portion of the complaints merely asserts

that defendants engaged in acts that were "deliberate, willful, intentional, wanton, malicious and

oppressive and constitute war crimes," that the acts occurred "during a period of armed conflict,"

that the war crimes were committed against the decedents "and others," that defendants are liable

for the war crimes, and that the misconduct caused "grave and foreseeable" injuries to the

plaintiffs. Compl., No. 1:09cv615, ¶ 37–42; Compl., No. 1:09cv616, ¶ ¶ 32–37; First Am.

Compl., No. 1:09cv617, ¶ ¶ 75–81; First Am. Compl., No. 1:09cv618, ¶ ¶ 89–94; Compl., No.

1:09cv645, ¶ ¶ 22–27. These sections allege no facts, but merely recite the elements, as plaintiffs

understood them, for claims of war crimes under the ATS. Accordingly, the "conclusory nature

of [the] allegations . . . disentitles them to the presumption of truth." *Iqbal*, 129 S. Ct. at 1951

(rejecting as conclusory, in a *Bivens* action, allegation that defendants "knew of, condoned, and willfully and maliciously agreed to subject" plaintiff to harsh conditions "solely on account of his religion, race, and/or national origin"). Whether plaintiffs have validly stated claims therefore depends on the factual content of the complaints, and not these conclusory statements.

The complaint in the first case, No. 1:09cv615, fails to allege any facts that create a plausible entitlement to relief on the war crimes claim against any of the defendants. As discussed *supra*, in No. 1:09cv615, Andrew Moonen, then a guard employed by Xe defendants, allegedly became severely intoxicated at a Christmas party, became lost, and, "stumbling drunkenly around Little Venice," shot and killed the decedent. Compl., No. 1:09cv615, ¶ 22. Plaintiffs allege that Xe defendants' employees were present at the Christmas Eve party and failed to prevent Moonen from leaving despite his visibly intoxicated state. This assertion does not support the war crimes claim for three reasons. First, plaintiffs have stated that they are not proceeding under the ATS on a theory of vicarious liability. Thus, the conduct of Xe defendants' employees is not pertinent to the question of the liability of Prince or Xe defendants. Second, failure to restrain an intoxicated person from leaving a party may support a plausible inference of negligence or recklessness, but it does not support an inference of intentional killing. Finally, these factual allegations do not support a plausible inference that the nexus requirement is met with respect to this claim.

Plaintiffs further allege that Prince, acting through Xe defendants, knowingly armed people he knew to be alcoholics. This factual allegation also does not support a plausible inference that Prince intentionally killed the decedent in No. 1:09cv615. First, plaintiffs do not

-32-

allege that Moonen himself is such an alcoholic. Thus, the factual allegation that Prince armed alcoholics does not tend to support the conclusion that Prince caused the decedent's death in this case. Second, even if Moonen were an alcoholic and Prince was aware of it, these facts do not give rise to a plausible inference that by arming Moonen, Prince intentionally caused the decedent's death. Instead, such facts would at most support a conclusion that Prince was negligent or reckless in entrusting Moonen with a weapon. Thus, while the conduct alleged in No. 1:09cv615, if true, is reprehensible, it does not give rise to a plausible inference that any of the defendants committed a war crime. Accordingly, plaintiffs have failed to state a claim of war crimes that is cognizable under the ATS. The federal claims in No. 1:09cv615 should therefore be dismissed for lack of subject-matter jurisdiction.

The four remaining cases, Nos. 1:09cv616, 1:09cv617, 1:09cv618, and 1:09cv645, allege similar factual bases. In all of these complaints, innocent Iraqi civilians are alleged to have been shot or severely beaten without reason by guards who, at the time of the alleged incidents, were working for Xe defendants. As in No. 1:09cv615, the complaints in the other four cases support a plausible inference of recklessness or negligence by defendants, but not of intentional killing or infliction of serious bodily harm. Indeed, the complaints accuse defendants of "a pattern and practice of recklessness in the use of deadly force." Compl., No. 1:09cv616, ¶ 18; First Am. Compl., No. 1:09cv617, ¶ 49, First Am. Compl., No. 1:09cv618, ¶ 81; Compl., No. 1:09cv645, ¶ 14. Plaintiffs allege that defendants knew that some of their guards were working while under the influence of chemical substances, that they hired known mercenaries, that they "created and fostered a culture of lawlessness," and that they refused to discipline guards who used excessive

force. Compl., No. 1:09cv616, ¶¶ 18–24; First Am. Compl., No. 1:09cv617, ¶¶ 49–57; First Am. Compl., No. 1:09cv618, ¶¶ 81–86; Compl., No. 1:09cv645, ¶¶ 13–21. Even assuming that these allegations are sufficiently non-conclusory under *Iqbal* and *Twombly* to be entitled to the presumption of truth, they do not give rise to a plausible inference that defendant Prince intentionally killed or severely harmed innocent Iraqi civilians. Specifically, plaintiffs do not allege any facts which would create a plausible inference that Prince possessed the requisite intent to kill or inflict serious bodily injury. At most, the factual allegations presently contained within the complaints would allow for a plausible inference that Prince was negligent or reckless. Finally, plaintiffs have not alleged facts creating an inference that the alleged conduct was committed in the context of and in association with an armed conflict. Accordingly, plaintiffs have not stated valid claims of war crimes cognizable under the ATS in these four cases. The claims should therefore be dismissed for lack of subject-matter jurisdiction.

In their responses to defendants' motions to dismiss, and at oral argument, plaintiffs represent that they have a sufficient factual basis to plead, consistent with Rule 11, Fed. R. Civ. P., that Prince ordered or otherwise directed the killings of innocent Iraqi civilians. During the course of the hearing held on August 28, 2009, plaintiffs, by oral motion of counsel, requested leave to amend the complaints as necessary to cure defects and provide additional detail. Such leave should be denied as futile as to No. 1:09cv615, but granted as to the other four cases.

Prior to trial, leave to amend is "freely given" in accordance with Rule 15(a), Fed. R. Civ. P. In this circuit, such leave is denied "'only when the amendment would have been prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment

would have been futile.'" *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (*en banc*) (quoting *Johnson v. Orowheat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)); *see also Sciolino v. City of Newport News*, 480 F.3d 642, 651 (4th Cir. 2007) (applying *Orowheat Foods* standard to post-dismissal context). There is no indication, at this early stage in these proceedings, that allowing plaintiffs leave to amend would cause any significant likelihood of prejudice to defendants. Moreover, there is no evidence to suggest that plaintiffs acted in bad faith by failing to plead factual allegations which meet the standard of *Iqbal* and *Twombly*. Thus, leave to amend may only be denied if amending the complaint would be futile. In other words, if the complaints as amended would nonetheless fail to state a claim upon which relief could be granted, then leave to amend may properly be denied. *See Steinburg v. Chesterfield County Planning Comm'n*, 527 F.3d 377, 390–91 (4th Cir. 2008) (upholding denial of leave to amend because plaintiff "has pointed to no material in his proposed amended complaint that would have changed the analysis conducted by the district court").

In No. 1:09cv615, it is pellucidly clear that plaintiffs' proposed amendment would not cure the present defect in the complaint. During the course of the hearing held on August 28, 2009, plaintiffs suggested that the Christmas party at which Moonen became intoxicated was a "Blackwater party," that it may have been "part of his employment" to attend, and that management in some way "played a role in encouraging him . . . to continue to carry his weapon after he was visibly intoxicated." Hearing on Defs.' Mots. to Dism. Tr. at 13–14. The addition of these vague factual allegations to the complaint would not remedy the defects or alter the analysis of the claims in this case. The mere fact that the party was sponsored by his employer or

-35-

that attendance was within the scope of his employment is inapposite to the question whether

defendants intended to kill the decedent. As amended, the complaint in No. 1:09cv615 would

fail to allege facts giving rise to a plausible inference that Prince engaged in *any* conduct with an

intent to kill, let alone that this conduct proximately caused the decedent's death. Moreover, the

allegation that Xe defendants allowed or encouraged Moonen to continue to carry his weapon

after he became intoxicated does not create a plausible inference that defendants intentionally

caused the decedent's death in this case. Indeed, the lengthy chain of inferences that would be

required to trace such conduct back to Prince's alleged directive to his employees to kill Iraqi

civilians is so tenuous that it does not even approach the plausibility standard articulated in *Iqbal*

and *Twombly*.[26] Accordingly, plaintiffs' oral motion for leave to amend the complaint in No.

1:09cv615 must be denied on grounds of futility. *See Steinburg*, 527 F.3d at 391.

In the other four cases, it is at least possible that plaintiffs will be able to cure the defects

in their complaints. More specifically, it seems possible that the complaints in Nos. 1:09cv616,

1:09cv617, 1:09cv618, and 1:09cv645 could be amended to add factual allegations that would

permit plausible inferences that Prince and Xe defendants ordered killings of innocent Iraqi

civilians, during an armed conflict, in the context of and in association with that armed conflict,

and that defendants' conduct proximately caused the injuries or deaths to plaintiffs. Thus, leave

is appropriately granted to plaintiffs to amend their complaints in these four cases. The onus

---

[26] Indeed, plaintiffs, through counsel, acknowledged during the hearing that No. 1:09cv615 "is the weakest" of their cases. Hearing on Defs.' Mots. to Dism. Tr. at 14. Moreover, plaintiffs acknowledged that they are unsure "[w]hether Moonen and that particular shooting fits within the rubric [of the war crimes] that we have learned about." *Id.*

remains on plaintiffs to plead facts, rather than conclusory statements, establishing a plausible inference that each of these required elements is met. Of course, if plaintiffs choose to amend their complaints in these four cases, defendants will be free to renew their Rule 12 motions to dismiss as to any or all of the re-pleaded claims.

## B. Summary Execution Claims

In two of the cases, Nos. 1:09cv617 and 1:09cv618, plaintiffs also claim that defendants directed summary executions in violation of the law of nations. To be sure, there is support for the existence of an international norm prohibiting *official* summary executions. Indeed, Congress has confirmed that such a norm exists. In creating a federal civil cause of action for extrajudicial killing in the Torture Victim Protection Act (TVPA), Congress required that the individual alleged to have violated the TVPA acted "under actual or apparent authority, or color of law, of any foreign nation." Pub. L. No. 102-256, § 2(a), 106 Stat. 73, 73 (1992). Moreover, it is clear that by enacting the TVPA, Congress codified its understanding of the international law norm governing the commission of summary executions. The TVPA's definition of extrajudicial killing closely tracks the language employed in the Geneva Conventions.[27] Moreover, the TVPA's definition expressly exempts "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." Finally, the report that accompanied the

---

[27] *Compare* TVPA § 3(a) (defining extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples"), *with* Fourth Geneva Convention, art. 3 (prohibiting "the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples").

TVPA to the Senate floor unambiguously states that "the TVPA incorporates into U.S. law the definition of extrajudicial killing found in customary international law."[28] As noted above, *Sosa* reaffirmed the rule that when Congress defines the international law norms at issue, courts are bound by its determination. *See Sosa*, 542 U.S. at 734. Because Congress has, by legislative enactment, expressed its understanding of the international law governing extrajudicial killings, judicial resort to the customs and usages of other nations is not appropriate.[29] Moreover, even assuming that the TVPA does not directly address the issue, plaintiffs would not find support in universally accepted international laws for the proposition that extrajudicial killings by non-state actors violates the law of nations, as the Geneva Conventions only prohibit executions without judicial process when they are committed by a party to an armed conflict.[30]

Yet, plaintiffs themselves assert that the alleged executions "were not carried out under

---

[28] S. Rep. No. 102-249, at 6 (1991).

[29] It is worth noting that the fact that Congress has defined the applicable norms of international law in this area does not compel the conclusion that the TVPA implicitly repeals all or part of the ATS or that the entire field of laws governing civil remedies for extrajudicial killing is preempted by the TVPA. Indeed, most courts have held that the TVPA supplements the ATS, and does not preempt it. *See Sinaltrainal v. Coca-Cola Co.*, No. 06-15851, 2009 WL 2431463, at *9 (11th Cir. Aug. 11, 2009) (analyzing torture and summary execution claims separately under ATS and TVPA); *Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009) (same); *Sarei v. Rio Tinto, PLC*, 550 F.3d 822 (9th Cir. 2008) (same); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) (same). *But see Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005) (concluding that TVPA occupies the field of civil remedies for claims of torture or extrajudicial killing). Because plaintiffs do not state a claim of summary execution cognizable under either the ATS or the TVPA, the question need not be decided here.

[30] *See* Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, art. 3. Accordingly, courts have consistently required state action to prove an ATS claim for summary execution. *See, e.g., Sinaltrainal*, 2009 WL 2431469, at *9; *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 203 (2d Cir. 2009) (quoting *Kadic*, 70 F.3d at 243); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984).

the authority of any country or court." Compls., Nos. 1:09cv617 ¶ 83, 1:09cv618 ¶ 96. Instead, they argue that in addition to being liable for war crimes, non-state actors are liable for summary executions committed during the course of war crimes. In making this argument, plaintiffs misread *Kadic* to create an exception to the normal rule requiring state actors for a cognizable claim for summary executions. In fact, *Kadic* merely acknowledges that the conduct alleged in a claim for summary executions, which would require state actors, could also be sufficient to state a claim of war crimes, which is cognizable against non-state actors. *Kadic*, 70 F.3d at 244.[31] Thus, because summary execution claims require state action, and none is alleged here, the summary execution claims must be dismissed without leave to amend.

## C. Exhaustion

Defendants further contend that plaintiffs should be required to exhaust their remedies in Iraq before they can bring their ATS claims in federal court. While the text of the ATS itself offers no basis for this argument, *Sosa* expressly reserves judgment on whether the ATS requires exhaustion of domestic remedies. 542 U.S. at 733 n.21 ("We would certainly consider [an exhaustion] requirement in an appropriate case."). Indeed, at least one court of appeals has applied a prudential exhaustion doctrine to ATS claims. *Sarei v. Rio Tinto, PLC*, 550 F.3d 822

---

[31] *See also Kadic*, 70 F.3d at 243 ("Torture and summary execution—when not perpetrated in the course of genocide or war crimes—are proscribed by international law only when committed by state officials or under color of law."). Indeed, the Second Circuit held that plaintiffs would have to prove the specific elements required to establish genocide and war crimes. *Id.* at 244; *see also Sinaltrainal*, 2009 WL 2431463, at *9–*10 (concluding that plaintiffs' ATS claims are not cognizable as summary execution claims due to absence of state action and not cognizable as war crimes despite "war crimes exception" to state action requirement due to absence of nexus with armed conflict).

(9th Cir. 2008). While it is far from clear that an exhaustion requirement is appropriate in this case,[32] even if it were, it would not prevent plaintiffs' claims from proceeding.

It is pellucidly clear that neither domestic nor international law requires exhaustion of an unavailable remedy.[33] Moreover, the Supreme Court has recently confirmed that failure to exhaust is an affirmative defense, and thus, defendants bear the burden to prove the existence of available, unexhausted remedies. *Jones v. Bock*, 549 U.S. 199, 212–14 (2007). Accordingly, in order to prevail in their exhaustion defense, defendants must show that plaintiffs may bring claims in Iraqi court against defendants arising from the conduct alleged in these cases.

Defendants cannot meet this burden because they agree with plaintiffs that Coalition Provisional Authority ("CPA") Order No. 17 shields defendants from liability in Iraqi courts for claims arising out of the conduct alleged in these cases. More specifically, Order No. 17, which

---

[32] In *Sarei*, the Ninth Circuit implemented a prudential exhaustion requirement for cases lacking a "significant United States 'nexus.'" 550 F.3d at 831. Specifically, in a case involving a "foreign corporation's complicity in acts on foreign soil that affected aliens," the plaintiffs were required first to exhaust their remedies in their home country. *Id.* Unlike the claims at issue in *Sarei*, these cases involve the conduct of U.S. citizens and entities who were working under contract with the U.S. Government in a country that was at the time occupied by the United States. Thus, the instant cases are quite meaningfully distinguishable from *Sarei* and at the very least present a far less compelling reason to impose a prudential exhaustion requirement. In any event, because the parties essentially agree that there is no available remedy in Iraq, the question whether an exhaustion requirement should be imposed upon ATS claims like these is essentially moot and need not be answered here.

[33] *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006) ("In habeas, state-court remedies are described as having been 'exhausted' when they are no longer available, regardless of the reason for their unavailability."); *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 830 (9th Cir. 2008) (adopting prudential exhaustion requirement for ATS claims) ("A core element of the exhaustion rule is its futility, or denial of justice exception, which excuses exhaustion of local remedies where they are unavailable or inadequate."); Restatement (Third) of Foreign Relations Law § 703 cmt. d (1987) (noting domestic remedies are exhausted for purposes of international law claims if no domestic remedy is available or it would be futile to pursue such remedy).

-40-

was subsequently incorporated into Iraqi law, immunizes contractors from "Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions" of a government contract. CPA Order No. 17 § 4(3). All of the Iraqi legal experts retained by the parties agree that Iraqi courts would most likely read Order No. 17 to bar claims against defendants for the conduct alleged in these cases.[34] Indeed, defendants acknowledge that Order No. 17 "appears to preclude plaintiffs from litigating their claims in Iraqi courts." Defs.' Consol. Post-Hearing Br. at 1. In arguing for dismissal, defendants merely recite the truism that one does not know for certain how a court will rule on an issue until it does so. *Id.* at 2 (quoting Defs.' Exp.'s 2d Supp. Rep. ¶ 5) (noting that "there is no guarantee" how an Iraqi court would rule). Defendants' assertion is plainly insufficient to meet their burden. Accordingly, defendants have not shown that plaintiffs failed to exhaust available Iraqi legal remedies and the claims therefore should not be dismissed on those grounds.

## D. Availability of Punitive Damages

Defendants assert that punitive damages are not available under the ATS. Yet, they offer no support in the case law or from recognized international treatises for this proposition. Indeed, a note in the current *Restatement of Foreign Relations Law* states that punitive damages are available under international law for the commission of international crimes. *Restatement (Third) of Foreign Relations Law of the United States* § 901 rep. n.5 (1997).[35] Accordingly,

---

[34] In federal courts, questions of foreign law are legal issues judicially determined upon consideration of any relevant material or source, including testimony. Rule 44.1, Fed. R. Civ. P.; *S.E.C. v. Dunlap*, 253 F.3d 768, 777 (4th Cir. 2001).

[35] In full, the note, titled "Punitive or exemplary damages," states that

courts have consistently awarded punitive damages for ATS claims.[36] Thus, punitive damages, if proven, are available for plaintiffs' ATS claims.

## III.

RICO affords a civil remedy for those who suffer property damage as a result of a violation of the criminal RICO provisions. 18 U.S.C. § 1964(c). To prevail, civil RICO plaintiffs generally must show that the defendant violated a provision of 18 U.S.C. § 1962, and that this violation caused damage to the plaintiffs' property.

---

[i]f a violation is not merely a delict but an international crime, see Reporters' Note 1, punitive damages may be awarded. In fixing the amount of an award, some international tribunals have taken into consideration the seriousness of the offense and included an element of punishment in the award. Borchard, The Diplomatic Protection of Citizens Abroad 419 (1915); see the case of The I'm Alone, 1935, 3 R.Int'l Arb.Awards 1616, 1618 (1949) ("as a material amend in respect of the wrong, the United States should pay the sum of $25,000" to Canada). For a contrary view, see Judge Parker's opinion in Lusitania Cases (United States v. Germany), 1923, 7 R.Int'l Arb. Awards 32, 38-44 ("counsel has failed to point us to any money award by an international arbitral tribunal where exemplary, punitive, or vindictive damages have been assessed against one sovereign nation in favor of another presenting a claim in behalf of its nationals"). In the United States, the Foreign Sovereign Immunities Act excludes punitive damages against a foreign state, but allows them against an agency or instrumentality of the foreign state. 28 U.S.C. § 1606.

Restatement (Third) of Foreign Relations Law of the United States § 901 rep. n.5 (1997).

[36] *See, e.g., Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009); *Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996); *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996); *Licea v. Curacao Drydock* Co., 584 F. Supp. 2d 1355 (S.D. Fla. 2008); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004); *Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262 (S.D.N.Y. 2002); *Cabello Barrueto v. Fernandez Larios*, 205 F. Supp. 2d 1325 (S.D. Fla. 2002); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322 (N.D. Ga. 2002); *Xuncax v. Gramajo*, 866 F. Supp. 162 (D. Mass. 1995); *Filartiga v. Pena-Irala*, 577 F. Supp. 860 (E.D.N.Y. 1984); *see also* 21 C.O.A.2d § 327 ("Punitive damages are likely warranted in any ATS case in which the plaintiff prevails on the merits [because ATS claims generally require wanton and willful misconduct].").

Certain plaintiffs in Nos. 1:09cv617 and 1:09cv618 allege that they suffered damage to property as a result of defendant Prince's violations of RICO §§ 1962(b) and 1962(c). Section 1962(b) prohibits the acquisition or maintenance of an interest in or control of an enterprise engaged in interstate or foreign commerce through a pattern of racketeering activity. 18 U.S.C. § 1962(b). Thus, to prevail on a claim alleging a violation of § 1962(b), the RICO plaintiffs must prove (i) that Prince engaged in a pattern of racketeering activity, (ii) that through this pattern, he acquired an interest in, or control of, an enterprise (iii) that engaged in activities affecting interstate or foreign commerce, and (iv) that this acquisition of an interest or control caused property damage to the RICO plaintiffs. *See Danielsen v. Burnside-Ott Training Ctr., Inc.*, 941 F.2d 1220, 1231 (D.C. Cir. 1991); *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, No. 3:07cv641, 2008 WL 2233979 (E.D. Va. May 30, 2008) (Order); *Davis v. Hudgins*, 896 F. Supp. 561, 567 (E.D. Va. 1995); *see also* Gregory Joseph, *Civil RICO: A Definitive Guide* § 13 (2000).

Plaintiffs have not made factual allegations sufficient to give rise to a plausible inference that Prince engaged in a pattern of racketeering activities as defined by RICO. A racketeering activity is defined as an act indictable under certain provisions of Title 18 of the United States Code, or

> any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . , which is chargeable under State law and punishable by imprisonment for more than one year.

18 U.S.C. § 1961. Plaintiffs claim that the "Prince RICO Enterprise" has committed violations of several federal statutes enumerated in § 1961. Specifically, plaintiffs allege violations of 18

-43-

U.S.C. § 1512(c) (destruction of evidence); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. §§

2251, 2251A, 2252, 2260 (sexual exploitation of minors); and 18 U.S.C. § 1952 (racketeering).

Plaintiffs also allege that the "Prince RICO Enterprise" committed murders and kidnapings.  Yet,

plaintiffs do not accuse Prince himself of committing these predicate acts, as required for Prince

to have violated § 1962(b).  Moreover, plaintiffs do not allege that Prince acquired an interest in,

or control of, an enterprise as a result of his pattern of racketeering activity.  18 U.S.C. § 1962(b).

Indeed, the complaints are completely devoid of any factual allegations suggesting that Prince

acquired control over his "RICO Enterprise" through his racketeering activities.  *Id.*  Instead,

plaintiffs merely plead that Prince's enterprise engages in illegal acts.  This is plainly insufficient

to prove a violation of § 1962(b).  *See Toucheque v. Price Bros. Co.*, 5 F. Supp. 2d 341, 350 (D.

Md. 1998) ("[Section 1962(b)] prohibits acquiring control of an enterprise through a pattern of

racketeering activity, and requires that the pattern of racketeering activity be the cause of the

acquisition of control" (citing *von Bulow v. von Bulow*, 634 F. Supp. 1284, 1307 (S.D.N.Y.

1986); *In re VMS Secs. Litig.*, 752 F. Supp. 1373, 1403–04 (N.D. Ill. 1990)).).

  Finally, plaintiffs do not establish a plausible basis for recovery for violations of §

1962(b) because they do not allege that they were injured as a result of Prince's acquisition of an

interest in, or control of, the enterprise.  The civil RICO provision requires that the injury occur

"by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  The violation, for purposes of §

1962(b), is the acquisition of control of the enterprise through the pattern of racketeering activity.

Thus, it is well-settled that proving causation under § 1962(b) requires proof of an "acquisition

injury."  *See, e.g., Fischbein v. Sayers*, No. 04-CIV-6589, 2009 WL 2170349 (S.D.N.Y. July 16,

2009); *Defazio v. Wallis*, 500 F. Supp. 2d 197 (E.D.N.Y. 2007); *In re Am. Honda Motor Co.*, 941 F. Supp. 528 (D. Md. 1996). Plaintiffs have not alleged that it was Prince's acquisition of control over the alleged RICO enterprise that caused their injuries; rather, they state that the predicate acts themselves caused the property damage they allegedly suffered. Accordingly, the RICO claims predicated on an alleged violation of § 1962(b) should be dismissed. Moreover, because plaintiffs' theory of RICO liability—that the alleged commission of predicate acts caused physical damage to plaintiffs' property—is inconsistent with the § 1962(b) requirement of an acquisition injury, granting leave to amend the complaints would clearly be futile. Accordingly, such leave must be denied. *Steinburg v. Chesterfield County Planning Comm'n*, 527 F.3d 377, 390–91 (4th Cir. 2008). Plaintiffs can only state a valid claim for civil RICO relief, if at all, to the extent that it is predicated on an alleged violation of § 1962(c).

Section 1962(c) is violated where a person associated with an enterprise engaged in interstate or foreign commerce conducts or participates in the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). Thus, the RICO plaintiffs state a valid claim for damages resulting from a § 1962(c) violation if they plead factual allegations creating plausible inferences (i) that Prince is associated with an enterprise (ii) that engages in or affects interstate or foreign commerce, (iii) that Prince conducted or participated in the conduct of the enterprise's affairs (iv) through a pattern of racketeering activity, (v) and that this pattern of racketeering activity caused the property damage to the RICO plaintiffs. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *AvalonBay Cmtys., Inc. v. Willden*, No. 1:08cv777, 2009 WL 2431571 (E.D. Va. Aug. 7, 2009); *see also* Gregory, *Civil RICO* § 14 (2000).

The RICO plaintiffs in Nos. 1:09cv617 and 1:09cv618 have alleged facts that create a plausible inference that the first three elements for a violation of § 1962(c) are met. They allege that Prince is associated with an enterprise—Xe defendants—that engages in interstate or foreign commerce by virtue of its contracting activities in Iraq. Moreover, the RICO plaintiffs allege that Prince wholly owns and controls this enterprise. Yet, the RICO plaintiffs fail to allege any facts relating to the final two elements required to show a violation of § 1962(c). As discussed above, plaintiffs do not allege that Prince himself has engaged in a pattern of racketeering activity, as required under § 1962(c). Rather, they only allege that the "Prince RICO Enterprise" has committed the predicate acts which would constitute a pattern of racketeering activity.

Moreover, in order for a pattern of racketeering activity to cause injury, the predicate acts constituting racketeering activity must themselves proximately cause the injury. *See Sedima*, 473 U.S. at 497 ("[T]he compensable injury necessarily is the harm caused by predicate acts . . . ."). In this matter, the only predicate acts which the RICO plaintiffs allege to have caused the injuries in question—damage to motor vehicles caused by the discharge of weapons—were murders. To qualify as RICO predicate acts, under § 1961, the murders must be "chargeable under state law." 18 U.S.C. § 1961. Thus, a RICO claim based on a predicate act committed in violation of state law "would fail if the state where the conduct occurred did not criminalize such conduct." *United States v. Le*, 316 F. Supp. 2d 355, 360 n.11 (E.D. Va. 2004) (citing *United States v. Marino*, 277 F.3d 11, 30 (1st Cir. 2002)). Yet, plaintiffs do not show how murders committed in Iraq are chargeable under the law of any state. Specifically, the complaints offer no factual allegations giving rise to a plausible inference that the conduct constituting murder occurred

-46-

within the territorial jurisdiction of a U.S. state. Thus, plaintiffs have failed to allege a pattern of racketeering activity which proximately caused the damage suffered by the RICO plaintiffs. Accordingly, the RICO claims predicated on an alleged violation of § 1962(c) should be dismissed.

In their briefs and in the course of the hearing on defendants' motions, plaintiffs represented that they have a good-faith basis to plead that Prince committed murders that are chargeable under state law. Specifically, plaintiffs state that they are prepared to plead, consistent with Rule 11, Fed. R. Civ. P., that Prince ordered or directed the killings allegedly committed in Iraq from within the United States, and that such conduct proximately caused the damage allegedly suffered by the RICO plaintiffs. If plaintiffs state nonconclusory factual allegations which give rise to plausible inferences that the elements of a violation of § 1962(c) are met, and that the violations proximately caused the damage suffered by the RICO plaintiffs, then they will have met the pleading requirements for this claim under *Iqbal* and *Twombly*. Accordingly, the RICO claims should be dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P., without prejudice and with leave to amend the claims predicated on violations of 18 U.S.C. § 1962(c).

Defendants further argue that, assuming the facts alleged in the complaints to be true, the RICO claim of plaintiff Al Rubae in 1:09cv618 is time-barred. The Supreme Court has held that civil RICO claims are subject to a four-year limitations period, and that this period begins to run no later than when the injury is discovered. *Rotella v. Wood*, 528 U.S. 549, 554 (2000). According to the complaint, the injury alleged—damage to Al Rubae's car caused by

gunfire—occurred in March 2005, and such damage would have been immediately apparent, since Al Rubae was allegedly in the car at the time. Thus, the applicable statute of limitations would have expired in March 2009, prior to the case's June 2, 2009 filing date. Accordingly, Al Rubae's RICO claim, being clearly time-barred, should be dismissed without leave to amend.

Defendants also argue that plaintiffs are not entitled to punitive damages or injunctive relief on their RICO claims. Indeed, is it well-settled that the statutory civil remedy for RICO violations—three times the value of damage to property—is exclusive. *See SouthStar Funding, LLC v. Sprouse*, No. 3:05cv253, 2007 WL 812174, at *5 (W.D.N.C. Mar. 13, 2007); *Toucheque v. Price Bros. Co.*, 5 F. Supp. 2d 341, 350 (D. Md. 1998); *see also Humana Inc. v. Forsyth*, 525 U.S. 299, 313 (1999); *Johnson v. Collins Entnm't Co.*, 199 F.3d 710, 726 (4th Cir. 1999). In their response to defendants' motions, plaintiffs do not offer any argument that they are entitled to such relief on their RICO claims. Accordingly, it is clear that the only relief to which plaintiffs may be entitled is for alleged RICO violations is the statutory remedy of treble damages.

## IV.

A necessary consequence of dismissal of all of the federal claims in Nos. 1:09cv615, 1:09cv616, and 1:09cv645 for lack of subject-matter jurisdiction is that the remaining claims in those cases must also be dismissed. This conclusion follows from the fact that the ATS claim is the sole federal claim alleged in those cases and there is, given the current complaints, no basis for either diversity jurisdiction under 28 U.S.C. § 1332, or supplemental jurisdiction under 28 U.S.C. § 1367.

It is well-established in this circuit that "state citizenship for purposes of diversity jurisdiction depends not on residence, but on national citizenship and domicile." *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 145 F.3d 660, 663 (4th Cir. 1998). Plaintiffs do not plead that defendants are citizens of a U.S. state. Instead, they only plead that defendant Prince is a resident of Virginia; the complaints also provide addresses in Virginia and North Carolina at which the defendant entities are allegedly "located." *See, e.g.*, Compl., No. 1:09cv615, ¶¶ 7–14. These facts, assumed to be true, are plainly insufficient to establish subject-matter jurisdiction under the federal diversity statute. Moreover, diversity jurisdiction does not exist in any case in which there are foreign citizens on both sides. *See Slavchev v. Royal Caribbean Cruises, Ltd.*, 559 F.3d 251, 254 (4th Cir. 2009) (concluding that jurisdiction under § 1332(a)(2) is lacking in a suit between a citizen of Bulgaria and a corporation incorporated in Liberia with a principal place of business in Florida). Plaintiffs acknowledge that defendant Graystone is incorporated in Barbados and therefore is a citizen of Barbados. Accordingly, because all plaintiffs are Iraqi citizens, there are foreign nationals on both sides of the case. Thus, diversity jurisdiction does not exist in any of these cases.

Plaintiffs request leave to amend to cure any defects in jurisdiction under § 1332. They indicate that if leave is granted, they will amend the cases to remove Graystone. Because it appears that plaintiffs may be able to cure the jurisdictional defect at issue here by (i) removing Graystone and (ii) stating the citizenship of all the defendants, such leave should be granted in all five of the cases as to the nonfederal claims.

Second, supplemental jurisdiction is also lacking in the three cases alleging only ATS

-49-

claims. Federal courts may only exercise supplemental jurisdiction over nonfederal claims if they form part of the same case or controversy as claims "of which the district courts have original jurisdiction." 28 U.S.C. § 1367. As discussed above, federal subject-matter jurisdiction is lacking over the ATS claims in Nos. 1:09cv615, 1:09cv616, and 1:09cv645. Moreover, plaintiffs have not alleged any other claims in those cases over which original jurisdiction exists. Accordingly, the nonfederal claims must be dismissed. Because all federal claims in No. 1:09cv615 are dismissed without leave to amend, leave to cure the jurisdictional defect under § 1367 as to the nonfederal claims in that case would be futile. Yet, as to Nos. 1:09cv616 and 1:09cv645, if plaintiffs amend the complaints to state claims cognizable under the ATS, then the jurisdictional hurdle of § 1367(a) will be cleared in those cases as to nonfederal claims that form part of the same case or controversy.[37] Accordingly, leave should be granted to replead the nonfederal claims alleged in Nos. 1:09cv616 and 1:09cv645 to state properly the existence of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## V.

Defendants argue that all of the claims in these cases raise nonjusticiable political questions and therefore must be dismissed. The analysis of the political question argument begins with *Baker v. Carr*, 369 U.S. 186, 217 (1962). In *Baker*, the Supreme Court declared that courts should not exercise jurisdiction over cases where one of six circumstances is present.[38]

---

[37] Decision is deferred as to whether such claims should nevertheless be dismissed under 28 U.S.C. § 1367(c).

[38] Specifically, the six circumstances in which a claim is nonjusticiable pursuant to *Baker* occur when: (i) there is a textually demonstrable constitutional commitment of the questions to be determined to the political branches, (ii) there is a lack of judicially discoverable and

Defendants contend that one of those circumstances is present here, namely that the questions presented in this matter involve issues that are constitutionally committed to the Executive Branch. This argument is unavailing.

The political question doctrine, applied in the national security context, prevents judicial second-guessing of the battlefield decisions of the U.S. government. *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Applying this principle, the Fourth Circuit has concluded that courts should not "dictate to a branch of the Department of Defense how it should react when it faces unknown and potentially hostile aircraft." *Tiffany v. United States*, 931 F.2d 271, 278–79 (4th Cir. 1991). In *Tiffany*, the North American Aerospace Defense Command (NORAD), a component of the U.S. Department of Defense, scrambled aircraft in response to an unidentified civilian airplane that had failed to file a valid flight plan. A military aircraft subsequently collided with the civilian plane, killing everyone on board the civilian plane. The widow of the pilot of the civilian craft brought suit against the government. Relying on the principles enunciated in *Baker v. Carr*, the Fourth Circuit concluded that the matter was nonjusticiable.

*Tiffany* is plainly distinguishable from the present matter. Specifically, *Tiffany* involved litigation against the United States over decisions made by federal employees acting within the scope of their federal employment. Indeed, the Fourth Circuit repeatedly emphasized the

---

manageable standards for resolving the question, (iii) the question could not be decided without an initial policy determination clearly meant for nonjudicial discretion, (iv) judicial determination would necessarily express a lack of the respect due the coordinate branches of government, (v) there is an unusual need for unquestioning adherence to a political decision already made, or (vi) there is the potential of embarrassment resulting from multifarious pronouncements by various political branches on one question. 369 U.S. at 217.

importance of the fact that the suit was against the government and required judicial evaluation

of the procedures and plans of a government agency on a question of national security. *See id.* at

275–78 (applying discretionary function exception to Federal Tort Claims Act), *id.* at 278

(emphasizing that NORAD is "a branch of the Department of Defense"); *id.* at 279 (noting that

alleged tortfeasors are "government agents"); *id.* at 281–82 (discussing discretion left to NORAD

under military regulations). On the rare occasion when claims against government contractors

have been deemed nonjusticiable, it has been because the claims depended critically on

battlefield policies and procedures of the United States government. *Carmichael v. Kellogg,*

*Brown & Root Services, Inc.*, 572 F.3d 1271 (11th Cir. 2009), on which defendants rely, is an

example of such a case. In *Carmichael*, the plaintiff brought suit against a government

contractor for injuries suffered while serving as a military escort in the contractor's truck as part

of a larger U.S. government convoy in Iraq. The plaintiff was injured when the truck crashed.

He alleged (i) that the contractor's employee was negligent for operating the vehicle at an unsafe

speed, for failing to keep a proper lookout, and for failing to inspect the vehicle, and (ii) that the

contractor was negligent in its hiring, supervision, and entrustment of the employee. On these

facts, the Eleventh Circuit concluded that the military had made virtually every essential decision

related to the convoy, including the speed of the vehicle, the date and time of departure, the

decision to travel along a particular route, how much fuel was to be transported, the number of

trucks necessary for the task, the distance to be maintained between vehicles, and the security

measures in place. *Id.* at 1281 ("There is not the slightest hint in the record suggesting that KBR

played even the most minor role in making any of these essential decisions."). Thus,

-52-

adjudicating Carmichael's claims of negligence would have required direct reevaluation of many

of the military's decisions concerning the convoy.  In other cases more analogous to this matter,

courts—including the Eleventh Circuit, which decided the case on which defendants rely—have

concluded that decisions made by government contractors during wartime are not shielded by the

political question doctrine.[39]

In this matter, defendants have not shown that adjudicating plaintiffs' claims would

require second-guessing the battlefield procedures, plans, or decisions of the United States

Armed Forces, or of any government entity.  Indeed, plaintiffs' allegations do not indicate that

the claims depend in any way on any determinations made by the federal government.  The

United States has appeared as an interested party and argues that if defendants committed the

alleged conduct, they were not acting as employees of the United States when they did so.

Moreover, the government states that its contracts with defendants "provided for multiple layers

of [Xe defendants'] management to oversee the day-to-day operations" of its employees and that

the employees were under the direct supervision of Xe defendants' management when the alleged

conduct occurred.  Gov't's Consol. Br. in Opp. at 12, 55–56.  Thus, there is no indication that

adjudication of plaintiffs' claims would require judicial determination of any issues committed

---

[39] *See Lane v. Halliburton*, 529 F.3d 548, 558–60 (5th Cir. 2008) (conduct of contractor for allegedly negligent conduct in Iraq did not necessarily require evaluation of military decisions and thus not shielded from judicial review); *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358–61 (11th Cir. 2007) (concluding that claims against Blackwater and related companies are justiciable because they do not necessitate second-guessing decisions by U.S. government); *Al Shimari v. CACI Premier Tech., Inc.*, 2009 U.S. Dist. LEXIS 29995 (E.D. Va. Mar. 18, 2009) (political question doctrine does not bar claims of contractor misconduct in the course of detaining captured Iraqi combatants).

by the text of the Constitution to the political branches. Accordingly, the political question doctrine does not bar these claims.[40]

## V.

Defendants contend that plaintiffs' nonfederal claims should be dismissed on *forum non conveniens* grounds. This argument is without merit. In considering whether dismissal for *forum non conveniens* is appropriate, courts must determine, as a threshold matter, "whether there exists an alternative forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981). Specifically, if defendants are not "'amenable to process'" in the foreign jurisdiction, then *forum non conveniens* dismissal is not appropriate. *Id.* (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506 (1947)). Moreover, the burden is on the party seeking dismissal to show the adequacy of the alternative forum. *See Fidelity Bank PLC v. N. Fox Shipping N.V.*, 242 F. App'x 84, 91–92 (4th Cir. 2007) (reversing *forum non conveniens* dismissal because defendants failed to establish that Nigerian courts would take jurisdiction over a claim for wrongful arrest that occurred in the United States). Accordingly, unless defendants show that Iraqi courts would hear claims arising out of the conduct alleged here, then these cases cannot be dismissed on *forum non conveniens* grounds.

The parties agree that CPA Order No. 17 shields defendants from liability in Iraqi courts

---

[40] Because the political question doctrine is jurisdictional in nature, it may be raised at any time. If, upon further development of the record in this cases, it appears that adjudication of plaintiffs' claims would require judicial evaluation of decisions constitutionally committed to the Executive Branch, defendants may renew their motions for dismissal on this ground. *See McMahon*, 502 F.3d at 1365 (affirming denial of motion to dismiss on political question grounds at pre-discovery stage, but noting that the defendant "remains free to assert the argument at any time").

for claims arising out of the conduct alleged in these cases. As noted previously, Order No. 17

specifically immunizes government contractors from "Iraqi legal process" for all claims arising

from conduct pursuant to the contracts. CPA Order No. 17 § 4(3). All of the parties' experts on

Iraqi law agree that this language protects defendants from civil liability in Iraqi courts on the

claims alleged in these cases. In their brief on the *forum non conveniens* issue, defendants

merely qualify their previously absolute position that plaintiffs lack a remedy in Iraq by noting

that "'there is no guarantee'" an Iraqi court would agree with their expert. Defs.' Consol. Post-

Hearing Br. at 2 (quoting Defs.' Exp.'s 2d Supp. Rep. ¶ 5). Defendants are correct. Indeed, there

is *never* a guarantee that a court will agree with a party's contention on a given matter. The

assertion that a mere possibility exists that a court would disagree with a legal argument is

plainly insufficient for defendants to meet their burden to establish the existence of an available

alternate forum for adjudication of these claims.[41] Accordingly, the claims should not be

dismissed on grounds of *forum non conveniens*.

## VI.

Defendants argue that plaintiffs' nonfederal claims should be dismissed for a variety of

reasons. Specifically, they argue (i) that Iraqi law grants defendants immunity from claims

arising there, (ii) that Iraqi law does not recognize vicarious liability, the tort of spoilation of

evidence, or punitive damages, (iii) that the negligent hiring and training claims are barred by the

government contractor defense, (iv) that the negligent hiring and training claims are barred by the

---

[41] Moreover, defendants have declined to request that the United States exercise its power to waive any immunity they may possess in Iraqi courts pursuant to Order No. 17.

-55-

doctrine of absolute immunity, (v) that the estate plaintiffs are not properly qualified under applicable law, and (vi) that certain nonfederal claims are barred by the applicable statute of limitations.

Because the resolution of these issues depends in part on whether and how plaintiffs re-plead their claims, and in light of the obvious difficulties associated with ascertaining the content of Iraqi law at the threshold motion stage, it is appropriate to defer ruling on defendants' motions to dismiss the nonfederal claims until a later time.

## VII.

In sum, plaintiffs have failed to state valid federal claims in these cases. Moreover, they have not properly pleaded the facts necessary for diversity jurisdiction to exist over the nonfederal claims, nor does supplemental jurisdiction exist as to the nonfederal claims in cases only alleging invalid ATS claims. Yet, the claims do not raise nonjusticiable political questions, nor should they be dismissed on grounds of *forum non conveniens*. Accordingly, plaintiffs may amend their complaints to re-plead claims to cure their present defects to the extent that such amendment would not be futile.

Appropriate Orders will issue.

Alexandria, Virginia
October 21, 2009

_____
T. S. Ellis, III
United States District Judge